IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
GAINESVILLE DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | : | |
| | : | CRIMINAL INDICTMENT |
| v. | : | NO.:  2:12-CR-028-RWS-JCF |
| | : | |
| SEAN KING | : | |

## REPORT AND RECOMMENDATION

This case is before the Court on Defendant King's Motion to Suppress Evidence Seized Pursuant to a Warrantless Search (Doc. 64), seeking to suppress items seized by Federal Bureau of Investigation ("FBI") agents from Defendant's residence on August 16, 2012.   Because the agents were authorized to enter Defendant's residence, where they observed the incriminating items in question in plain view, it is **RECOMMENDED** that Defendant's motion to suppress be **DENIED**.

## Background

A Criminal Complaint filed August 15, 2012 (Doc. 1) alleged the following:

On or about July 18 and 19, 2012 in Fulton and White Counties, [Defendants King, Larry McDaniel, and Howard Brown] aided and abetted by each other and others unknown, did corruptly endeavor to influence, obstruct and impede the due and proper administration of the law under which a proceeding was pending before the [FBI], that is, the defendants influenced, obstructed and impeded, and did attempt

1

> to do so, an undercover investigation being conducted by Special
> Agents of the [FBI] in which D.S. was acting as a confidential
> informant and in which D.S. was engaging in undercover tape
> recorded conversations with targets of the investigation about possible
> violations of federal law, by advising targets of the investigation and
> other that the defendants had in their possession information that D.S.
> was cooperating with the FBI as an informant[.]

Defendant King was arrested on August 16, 2012 on an arrest warrant issued on the criminal complaint.  (*See* Doc. 26).   Count One of an Indictment filed September 4, 2012 (Doc. 39) charges Defendant King, along with co-defendants McDaniel and Brown, with obstructing and impeding "the due and proper administration of the law under which a proceeding was pending before the Federal Bureau of Investigation, an agency of the United States," by influencing, obstructing, and impeding, and attempting to influence, obstruct, and impede, "an investigation being conducted by Special Agents of the Federal Bureau of Investigation in which D.B.S. was acting as a confidential informant," in violation of 18 U.S.C. § 1505 and 18 U.S.C. § 2 (aiding and abetting statute).[1]   The charges in this case, along with several other cases pending in this Court, arise from an FBI investigation into the alleged criminal activities of members of the "Outlaw

---

[1] In a Report and Recommendation dated January 29, 2013 (Doc. 110), the undersigned has recommended that Defendants' motion to dismiss Count One be granted.  The District Judge has not ruled on those motions, and therefore Count One remains pending.

Motorcycle Club" ("OMC") and affiliated clubs, described by the Government as

follows:

> The FBI, through the use of an undercover agent and cooperating
> individuals, developed evidence that members and persons associated
> with the OMC and its affiliates were involved in illegal drug and
> firearms trafficking which led to multiple indictments.
>
> Brad Smith ["Smith"], the then-President of the Black Pistons
> Motorcycle Club's Cleveland, Georgia chapter, an OMC-affiliated
> gang, was working as an FBI confidential informant.  Smith
> introduced an undercover law enforcement officer ["Griff" or
> "Griffin"] to the motorcycle gang community in North Georgia.  Griff
> posed as Smith's long-time friend and a big time drug dealer from
> Florida who was looking to expand his drug trafficking business into
> North Georgia and Tennessee.  The FBI's investigation included using
> Smith and Griff to record conversations with targets concerning their
> criminal activities; Griff purchasing and attempting to purchase illegal
> drugs, including methamphetamine, marijuana and LSD; and Griff
> paying members and persons associated with the OMC and its
> affiliates to provide protection for both real and sham drug deals.

(*See* Doc. 93 in Case No. 2:12-CR-18-RWS-JCF at 2-3).

On October 3, 2012, Defendant filed the pending motion to suppress (Doc.

64), seeking to suppress evidence seized by FBI agents from his residence on

August 16, 2012.  The Court conducted a hearing on Defendant's motion on

December 6, 2012 (*see* Doc. 93), and a transcript of the hearing was filed on

January 22, 2013 (Doc. 106).[2]  The Government filed a post-hearing brief on

February 6, 2013 (Doc. 116), and Defendant filed a post-hearing brief on February

---

[2] References to the transcript of the December 6, 2012 hearing are designated as
"Tr. ___."

3

20, 2013 (Doc. 120).   The Government did not file a reply brief.   Therefore briefing is complete, and the undersigned now considers the merits of Defendant's motion.

## Facts

At the December 6, 2012 hearing, the Government presented the testimony of FBI Special Agents Michael Greene, Robert Gibbs, and Mark Sewell. Defendant presented the testimony of Wade King, Defendant's father, and Carmen Sheppard, Defendant's sister.

Agent Greene is an Assistant Team Leader for an FBI SWAT team.  (Tr. 7). The SWAT team participates in executing arrest warrants where the person to be arrested is suspected of being violent or heavily armed.  (Tr. 8).  On August 16, 2012, Agent Greene and his SWAT team assisted in the execution of arrest warrants related to the investigation of the Outlaw Motorcycle Club in Georgia. (Tr. 8).   Agent Sewell, the case agent, had advised Greene that he had been working "a long-term investigation where [the FBI] had developed information, obtained arrest warrants and search warrants for a number of people that were members of the Outlaw Motorcycle Gang."  (Tr. 8, 26).

On the morning of August 16, 2012, the SWAT team first went to the Outlaw clubhouse in Atlanta to execute warrants.  (Tr. 9).   After leaving the

clubhouse at approximately 5 a.m., the team traveled to Gordon, Georgia to execute an arrest warrant on Defendant King at his residence.  (Tr. 9-10).  Agent Sewell had previously conducted a briefing during which he gave the team information about the charge against Defendant, i.e., obstruction of justice, where Defendant lived, what he looked like, his criminal history, "and that he was possibly armed, considered armed and dangerous," and also told the team about the type of objects to look for while they were making their arrests.  (Tr. 10, 20, 26-27).  Agent Greene explained that Defendant was considered armed and dangerous "based [on the FBI] investigation . . . into the Outlaw Motorcycle Gang where violence and intimidation has been used in the past, usually they are armed[.]"  (Tr. 26-27).

When the team arrived at Defendant's residence, sometime between 6 a.m. and 7 a.m., they spoke with agents from the Macon office who were already at the location. (Tr. 10, 47-48, 63-64).  Three Macon agents, including Agents Gibbs, Langdon, and Hull, had arrived earlier, between 5:30 a.m. and 6 a.m., to watch the residence, and to arrest Defendant if he tried to leave.  (Tr. 10-11, 28, 43-45). The agents believed that Defendant was in the home because lights were on inside, there was a vehicle parked in front of the residence, there was a light on in the detached garage, and one of the garage doors was open.  (Tr. 12-14, 29-30, 46-47,

60-61). The Macon agents advised Greene that they had not seen anyone leave the residence, and they believed Defendant was still there. (Tr. 11, 29, 48). Although the agents had also been told that Defendant had a motorcycle, they did not observe it at the location. (Tr. 12, 30-31, 47, 62).

Once the SWAT team arrived, their task was to effectuate the arrest warrant while the Macon agents maintained a perimeter to prevent Defendant's escape if necessary. (Tr. 11, 49). The SWAT team used a battering ram to open a side entrance, and threw in flash-bang devices to create a diversion while they entered to make the arrest.[3] (Tr. 14-15, 32). Approximately 10 members of the team entered the residence to secure it and to look for Defendant, while a couple other members remained outside. (Tr. 15-16). They were in the residence for no more than five minutes. (Tr. 32-33, 49, 64). They searched all places where a human could hide, including cabinets, closets, under the bed, behind couches, etc. (Tr.

---

[3] It is not clear from the testimony whether agents complied with 18 U.S.C. § 3109, which, consistent with the Fourth Amendment, requires that "law enforcement officers [executing search and arrest warrants] must announce their presence and provide residents an opportunity to open the door," *Hudson v. Michigan*, 547 U.S. 596, 589 (2006), prior to breaking down a door to enter a house. Even if the agents had announced their presence, it would not have mattered in this case since Defendant was not home. Furthermore, Defendant makes no argument that agents violated the "knock-and-announce" requirement, and even if he had, "[a] failure to comply with the knock-and-announce requirement embodied in the Fourth Amendment does not trigger the exclusionary rule." *United States v. Cole*, No. 1:09-CR-0412-ODE-RGV, 2010 U.S. Dist. LEXIS 82822, at *73 (N.D. Ga. Aug. 11, 2010), *adopted by* 2010 U.S. Dist. LEXIS 82737 (N.D. Ga. May 12, 2010).

16).  They did not search areas too small for a human to hide, such as drawers or file cabinets.  (Tr. 16-17, 39).  These efforts did not result in Defendant, or anyone else, being located in the house.  (Tr. 16).

Agent Greene had experience with or knowledge of motorcycle clubs in general, including the Outlaw Motorcycle Club and "the paraphernalia or symbols that members of the Outlaw Motorcycle Club in particular would display[.]"  (Tr. 17).  In clearing Defendant's residence, Greene saw a gym bag in the kitchen with a picture of a hand holding a gun and the phrase "Support your local Outlaws" on it.  (Tr. 17-19; *see also* Gov't Ex. 11).  In the master bedroom, Greene observed other objects with Outlaw indicia, including rings, a patch, and a belt buckle.  (Tr. 19-21; *see also* Gov't Exs. 7-9).

Agent Greene then contacted Agent Sewell and told him what he had seen in the house, and asked Sewell if he wanted the agents to seize the items described above.  (Tr. 22).  Sewell responded that he wanted the items seized, but he had another assignment for Greene's team in a different location, so they decided to have the Macon agents photograph and seize those items.  (Tr. 22-23, 70-71).  Agent Sewell believed the Outlaw paraphernalia to be relevant to the charge of obstruction against Defendant.  (Tr. 70-71).  Sewell explained at the hearing, that the items "tie Mr. King to the Outlaw Motorcycle Club, which was the basis for the

complaint on July 19th.  That he was acting in his capacity as a member of the club when he shut down another club associated with the Outlaw(s) [sic]."  (Tr. 73).

Agent Greene advised the Macon agents the house was clear, that Defendant was not present, and that the Macon agents needed to photograph the items to be seized and then seize them. (Tr. 23, 49-51).  Greene took one of the Macon agents through the house to point out the objects he had previously seen that were to be seized, i.e., the gym bag in the kitchen and objects on the dresser in the master bedroom.  (Tr. 23, 50, 65).  Greene then left the house to brief his team about their next assignment, when one of the Macon agents told him there was a pistol in the master bedroom.  (Tr. 24).  Greene had not seen the pistol when he was in the house to clear it.  (Tr. 24).  Greene went back into the master bedroom, and the agents showed him where the pistol, which was in a mini holster on an open shelf on the nightstand, was located.  (Tr. 24-25; *see also* Gov't Ex. 3).  One of the agents contacted Agent Sewell, who instructed the agent to seize the pistol because Sewell "knew that Mr. King had been alleged to carry a pistol on July 19th when he confronted the informant and shut down the clubhouse," so he believed the pistol to be relevant to the case.  (Tr. 70).  Greene and his team then left the residence to go to their next assignment, leaving the Macon agents at the residence.  (Tr. 25).

The Macon agents entered the residence at approximately 7:15 a.m. and seized the items that had been previously identified, including a "Support Your Local Outlaws" drink holder, patch, belt buckle, and rings from the dresser in the master bedroom, the gun on the nightstand, the gym bag in the kitchen (Tr. 51, 56-57, 64-67; *see also* Gov't Exs. 3, 9, 11). The Macon agents did not open any drawers. (Tr. 51-52). They took photographs of the items to be seized and also took exit photographs to "show the residence as it was when [they] left it." (Tr. 52). The agents left the residence at approximately 7:40 a.m. (Tr. 64-65).

Wade King, Defendant's father, went to Defendant's house later that morning and met with Defendant. (Tr. 74-75). Mr. King observed that there were clothes on the laundry room floor, which he thought was unusual; the sectional sofa was moved out from the wall and taken apart; the television was pulled out from the wall; filing cabinets were moved from the wall, and the drawers were ajar; the bed had been moved; and the kitchen cabinets were open. (Tr. 77-81, 83).

## Discussion

Defendant argues that the items seized from his house on August 16, 2012 should be suppressed because they were seized in violation of the Fourth Amendment, i.e., Government agents did not reasonably believe Defendant was home when they entered his residence to execute the arrest warrant, and therefore

were not authorized to be present in the place where they viewed the items at issue. (*See* Doc. 120, Def. Br. at 1, 4).  Furthermore, Defendant argues the agents "improperly expanded the scope of the search incident to arrest warrant to include a warrantless search of [his] home."  (*Id.* at 1).  The Government argues that the challenged seizure was proper because the agents were authorized to enter Defendant's residence to execute the search warrant, and were then authorized to seize incriminating evidence in "plain view" of the seizing agents.  (Doc. 116, Gov't Br. at 5-10).

The Fourth Amendment provides that "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause . . . ."  U.S. Const. amend. IV.  "Under the Fourth Amendment, searches and seizures inside a home without a warrant are presumptively unreasonable." *United States v. Davis*, 313 F.3d 1300, 1302 (11th Cir. 2002) (internal quotation omitted). Where a seizure is made without a warrant, as in this case (*see* Tr. 17), the burden is on the government to "demonstrate that the challenged action falls within one of the recognized exceptions to the warrant requirement, thereby rendering it reasonable within the meaning of the fourth amendment." *United States v. Freire*,

710 F.2d 1515, 1519 (11th Cir. 1983).  The exception relied on by the Government here is the "plain view doctrine."

"The 'plain view' doctrine permits a warrantless seizure where (1) an officer is lawfully located in the place from which the seized object could be plainly viewed and must have a lawful right of access to the object itself; and (2) the incriminating character of the item is immediately apparent."  *United States v. Smith*, 459 F.3d 1276, 1290 (11th Cir. 2006).

The undersigned finds that the Government has met its burden to prove that the seizure of the Outlaw Motorcycle Club-related items (from the master bedroom dresser and in the kitchen) and the pistol (from the nightstand) did not violate the Fourth Amendment.

In the first place, the agents were authorized to enter Defendant's residence to arrest him pursuant to an arrest warrant.  "For Fourth Amendment purposes, an arrest warrant founded on probable cause implicitly carries with it the limited authority to enter a dwelling in which the suspect lives when there is reason to believe the suspect is within."  *Payton v. New York*, 445 U.S. 573, 603 (1980). "*Payton* thus requires a two-part inquiry: first, there must be a reasonable belief that the location to be searched is the suspect's dwelling, and second, the police must 'have reason to believe' that the suspect is within the dwelling."  *United*

11

*States v. Magluta*, 44 F.3d 1530, 1533 (11th Cir. 1995).  "[I]n order for law enforcement officials to enter a residence to execute an arrest warrant for a resident of the premises, the facts and circumstances within the knowledge of the law enforcement agents, when viewed in the totality, must warrant a reasonable belief that the location to be searched is the suspect's dwelling, and that the suspect is within the residence at the time of entry."  *Id.* at 1535.

As an initial matter, Defendant does not contest that the agents had a reasonable belief that the residence where they sought to arrest Defendant was his residence.  The critical issue here is whether the agents reasonably believed that Defendant was present in his residence.  The undersigned finds that the agents' belief was reasonable, given the totality of the circumstances, including: they were at his residence early in the morning when one would expect a person to be home; no one was observed leaving the residence; a vehicle was parked outside; and a light was on inside the home.  *See, e.g. United States v. Bervaldi*, 226 F.3d 1256, 1267 (11th Cir. 2000) (finding that "[i]t was reasonable to believe, in the absence of contrary evidence, that [the defendant] would be at his residence at 6:00 in the morning," and noting that "[t]he fact that vehicles were parked at the residence only buttresses the belief that persons were at the house, including presumably [the defendant]"); *United States v. Beck*, 729 F.2d 1329, 1331-32 (11th Cir. 1984)

(finding that agents reasonably believed that the defendant was at home at the time of entry into his apartment in light of the fact that the defendant's vehicle was parked nearby, and "it was reasonable to believe that one would be at home at 7:30 a.m. and be sound asleep").

Defendant argues, however, that their belief was not reasonable because the agents knew that he rode a motorcycle, but they did not see a motorcycle present, and because they did not know if he could have already gone to work.  (*See* Doc. 120, Def. Br. at 6-7).  These facts are not determinative.  "Neither *Payton* nor this court's Fourth Amendment jurisprudence requires law enforcement officers to be absolutely certain that a suspect is at home before entering a residence to execute an arrest warrant."  *Magluta*, 44 F.3d at 1538.  The circumstances described above were sufficient to support the agents' reasonable belief that Defendant was inside his residence when they entered it to arrest him.

Once inside the home, the agents were authorized "to engage in a protective sweep of the premises" to look for Defendant, *see Magluta*, 44 F.3d at 1538, and were authorized to look in any area in which he could have been hiding.  *See Maryland v. Buie*, 494 U.S. 325, 335 (1990) (explaining that a protective sweep is limited to "a cursory inspection of those spaces where a person may be found");

*see also Beck*, 729 F.2d at 1332 (finding it reasonable for officers to look in closet while searching for the arrestee because he "could hide in a closet").

Moreover, the agents "were free to seize any evidence they discovered in plain view within the proper scope of the protective sweep." *United States v. Tobin*, 923 F.2d 1506, 1513 (11th Cir. 1991).  Defendant argues that the agents exceeded the permissible scope of their search for Defendant because agents remained in his home longer than necessary to determine he was not there, and "[t]here is evidence that this intrusion turned into a broader search."  (*See* Doc. 120, Def. Br. at 8-12). The undersigned disagrees.  There is no evidence that the agents searched any areas, such as drawers, where Defendant could not have hidden.[4]  Instead, the SWAT team quickly moved through the house, spending no more than five minutes looking only in areas where Defendant could have been hiding.[5]  During their search for Defendant, they observed Outlaw paraphernalia in plain view in the kitchen and in the master bedroom, and determined, in

---

[4] Although Defendant's father testified that he observed file cabinet drawers ajar about a half an inch (Tr. 82-83), there is no evidence that any agent opened those drawers, or that any evidence that was seized was found in those drawers. Defendant's speculation that agents obtained information about where he worked from those file cabinets (see Doc. 120, Def. Br. at 11) is insufficient to show that the agents did so.

[5] Defendant asserts that the SWAT team "was in Mr. King's house for nearly 40 minutes before bringing in the Macon agents," but the uncontroverted testimony is that the sweep took no more than five minutes (*see* Tr. 32-33, 49, 64), and Agent Greene testified he was in the house no more than 10 minutes (Tr. 41).

consultation with the case agent, Agent Sewell, that the items were incriminating and should be seized.  Moreover, while effectuating the seizure of those items, an agent observed a gun in plain view on a nightstand shelf.[6]  Again, in consultation with Agent Sewell, the agents determined that the gun was incriminating and should be seized.  There is no evidence that the agents impermissibly expanded the scope of their search for Defendant in order to search for evidence in places Defendant could not have been hiding, nor is there evidence that the items they observed were found in such places.  *See, e.g.*, *United States v. Weeks*, 666 F. Supp. 2d 1354, 1373 (N.D. Ga. 2009) ("Here, the agents were lawfully conducting a protective sweep of an area of the bedroom where Weeks could have been hiding, and the ammunition was not located under the mattress, but was found in plain view in an open drawer of a night stand," and therefore, "Inspector Warren

---

[6] Defendant asserts that "Agent Greene admitted that he did not see the pistol that was found.  Some other unknown agent found the weapon at sometime after it was clear that Mr. King was not there," and therefore, "[t]he Government has not met its burden to demonstrate that the pistol was in plain view of someone that was lawfully inside Mr. King's home."  (Doc. 120, Def. Br. at 12).  The undersigned disagrees.  Agent Greene testified that, although he had not seen the pistol when he was in the house looking for Defendant, one of the Macon agents who was in the house securing the evidence to be seized told him there was a pistol in the master bedroom.  (Tr. 24).  Greene went back into the master bedroom, and the agents showed him where the pistol, which was in a mini holster in plain view on an open shelf on the nightstand, had been found.  (Tr. 24-25; *see also* Gov't Ex. 3).

was justified in seizing the ammunition."), *adopted by* 666 F. Supp. 2d 1354, 1358 (N.D. Ga. 2009).

Nor did the agents impermissibly expand the scope of the search by entering the residence to photograph and seize the evidence observed during their search for Defendant. *See, e.g.*, *United States v. Varner*, 481 F.3d 569, 573 (8th Cir. 2007) (finding that officer was authorized to reenter residence to seize evidence previously observed in plain view a few minutes earlier, and was authorized to seize additional evidence observed after he reentered the residence); *United States v. Hill*, No. 11-CR-0015 (DWF/LIB), 2011 U.S. Dist. LEXIS 42410, at *26-27 (D. Minn. Mar. 31, 2011) (finding that officers were authorized to reenter residence to photograph blood stains previously observed in plain view, noting that courts generally "consider the subsequent re-entry in order to actually collect the evidence to be a continuation of the original entry," so long as the scope of the initial invasion is not expanded, and explaining "it would have been unreasonable to expect the officers to take the photographs during their first entry into the Defendant's home because the officers were preoccupied with finding [a person believed to] be in physical danger"), *adopted by* 2011 U.S. Dist. LEXIS 42464 (D. Minn. Apr. 19, 2011).   The undersigned finds that in this case, it was not unreasonable for the SWAT team members to complete their search for Defendant

before allowing the Macon agents to photograph and seize the evidence observed in plain view, rather than immediately seizing the evidence while they searched for Defendant.  The Macon agents' entry into the house was simply a continuation of the original entry; they did not expand the scope of the original invasion.

Finally, although Defendant does not appear to challenge the Government's assertions about the incriminating nature of the seized items directly (*see* Doc. 116, Gov't Br. at 9-10), Defendant does assert that the seized property was "not itself contraband." (Doc. 120, Def. Br. at 12).  "[T]he scope of the 'plain view' doctrine extends to the seizure of items that, while not contraband themselves, may be used as evidence against a defendant."  *United States v. Smith*, 459 F.3d 1276, 1293 (11th Cir. 2006).  In *Texas v. Brown*, 460 U.S. 730 (1983), the Supreme Court reiterated that the standard for determining whether an officer can seize an item in plain view without a warrant is as follows: "the seizure of property in plain view involves no invasion of privacy and is presumptively reasonable, assuming that there is probable cause to associate the property with criminal activity."  *Id.* at 741-42 (internal quotation omitted); *see also United States v. Edwards*, No. 1:10-CR-132-RWS/AJB, 2010 U.S. Dist. LEXIS 132690, at *22 (N.D. Ga. Oct. 13, 2010) ("Probable cause to seize an item in plain view exists whenever the facts available to the searching officer support a reasonable belief that the item may be

17

contraband, stolen property, or evidence of a crime" (citing *Brown*, 460 U.S. at 742)), *adopted by* 2010 U.S. Dist. LEXIS 132711 (N.D. Ga. Dec. 15, 2010). The Court in *Brown* further explained:

> [P]robable cause is a flexible, common sense standard. It merely requires that the facts available to the officer would "warrant a man of reasonable caution in the belief," *Carroll v. United States*, 267 U.S. 132, 162 (1925), that certain items may be contraband or stolen property or useful as evidence of a crime; it does not demand any showing that such a belief be correct or more likely true than false. A "practical, nontechnical" probability that incriminating evidence is involved is all that is required. *Brinegar v. United States*, 338 U.S. 160, 176 (1949).

460 U.S. at 742. In determining whether there is "probable cause to associate property with criminal activity," the court considers the totality of the circumstances, including the searching officer or agent's training, experience, observations, inferences drawn from those observations, and the nature of the investigation at issue. *See, e.g.*, *Brown*, 460 U.S. at 742-43 (finding that officer had probable cause to believe that balloons contained illicit substances based on the officer's experience with narcotics cases, discussions with other officers, and the officer's observations of other nearby items); *Smith*, 459 F.3d at 1291-93 (upholding the seizure of photographs of girls who appeared to be younger than 18 based on the seizing officers' inference that the photographs depicted girls younger than 18, regardless of whether they were correct in their assessment, because in

18

determining whether probable cause exists, the court "give[s] weight to the inferences that law enforcement agents draw from the facts"); *Edwards*, 2010 U.S. Dist. LEXIS 132690, at *25-26 (finding that officers properly seized a document containing names and telephone numbers under the plain view doctrine based on the nature of the investigation into narcotics trafficking, and noting that personal telephone directories have been found admissible in narcotics trials as "tools of the trade").

Given the totality of the circumstances collectively known by the agents, the undersigned finds that they had "probable cause to associate the [seized items] with criminal activity." *Brown*, 460 U.S. at 741-42.  The SWAT team who conducted the sweep of the residence had been briefed by the case agent, Agent Sewell, about the FBI's investigation of the Outlaw Motorcycle Club, and had information that Defendant was a member of that club; they had been advised by Agent Sewell to be on the lookout for items related to the Outlaw Motorcycle Club; they had participated in the execution of warrants at the Outlaw clubhouse just before they went to Defendant's residence; and they were informed of the charge against Defendant for allegedly obstructing the FBI's investigation into the Outlaw Motorcycle Club.  Agent Sewell explained that he directed the agents to seize the pistol because he "knew that Mr. King had been alleged to carry a pistol

on July 19th when he confronted the informant and shut down the clubhouse" (Tr.

70), an allegation that supports the charge against Defendant.

Similarly, the Outlaw-related items connect Defendant to a motorcycle club

whose members were under investigation by the FBI, an investigation Defendant

and other club members are charged with obstructing. Accordingly, the Outlaw-

related items could be relevant to explain how Defendant knows the other

defendants charged in this and other indictments; relevant to how he knew about

the investigation at issue; and relevant to a possible motive for allegedly

obstructing the investigation. On this point, it is worth noting that multiple cases

have concluded that evidence tending to show a connection with a group suspected

of criminal activity may be considered incriminating. *See, e.g., Messerschmidt v.

Millender*, 132 S. Ct. 1235, 1247 (2012) (rejecting the defendant's argument that

"no reasonable officer could have believed that the affidavit presented to the

magistrate contained sufficient basis to conclude that the gang paraphernalia

sought was contraband or evidence of a crime" because it would not have been

unreasonable "for an officer to believe that evidence regarding [the defendant's]

gang affiliation would prove helpful in prosecuting him," e.g., to help establish

motive for the attack being investigated, to impeach the defendant, or to rebut his

defenses); *United States v. Wright*, 343 F.3d 849, 853, 863 (6th Cir. 2003) (finding

that officers were authorized to seize items not explicitly listed in a search warrant, including a leather motorcycle vest which was "evidence of Wright's involvement with the Avenger's motorcycle club," because such evidence "indicated Wright's involvement in the drug conspiracy" conducted through the Avengers, and his involvement in the murder of another member of the Avengers); *United States v. Apker*, 705 F.2d 293, 298 (8th Cir. 1983) (explaining that, in a case involving a conspiracy to distribute methamphetamine, proof of association through membership in an organization is admissible in a conspiracy trial to show the association of defendants with each other, and finding that evidence of Hells Angels membership "would help prove their opportunity to use the Hells Angels organization for criminal activities").[7]

Because the Government has shown that the seizure of the items from Defendant's residence on August 16, 2012 did not violate the Fourth Amendment, it is **RECOMMENDED** that Defendant King's motion to suppress be **DENIED**.

### Summary

For the foregoing reasons, it is **RECOMMENDED** that Defendant King's motion to suppress evidence (Doc. 64) be **DENIED**.

---

[7] The undersigned acknowledges that *Millender, Wright,* and *Apker* involve seizures of evidence pursuant to search warrants. They are cited, however, solely as support for the proposition that evidence that tends to reflect membership in a gang or club can constitute incriminating evidence.

**IT IS SO REPORTED AND RECOMMENDED** this  22nd  day of

March, 2013.

 /s/  *J. Clay Fuller*
J. CLAY FULLER
United States Magistrate Judge